NOT FOR PUBLICATION                                                    (Doc. No. 15)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____
                                                    :
ERNESTINE DIGGS,                                    :
                                                    :
            Plaintiff,                              :
                                                    :           Civil No. 10-2537 (RBK)
      v.                                            :
                                                    :               **OPINION**
MICHAEL J. ASTRUE, Commissioner                     :
of Social Security,                                 :
                                                    :
            Defendant.                              :
_____          :

**KUGLER**, United States District Judge:

       This matter comes before the Court on an appeal filed by Plaintiff Ernestine Diggs from a

decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff

disability insurance benefits pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. §

405(g).  For the reasons expressed below, the Court will affirm the Commissioner's decision that

Plaintiff is not entitled to disability insurance benefits.

**I.       BACKGROUND**

   **A. Procedural History**

       Ernestine Diggs is a forty-seven year-old woman who filed an application with the Social

Security Administration (the "Administration") for disability insurance benefits and

supplemental security income ("SSI") on April 20, 2005.  (Tr. 15).  In both applications, Plaintiff

alleged that her disability results from an injury she sustained on December 6, 2002.  (Id.).  The

Administration denied her claims on August 26, 2005, and again upon reconsideration on

December 13, 2005.  (Id.).  Thereafter, Plaintiff requested a hearing before an administrative law

judge ("ALJ") on December 16, 2005.  (See 20 CFR §§ 404.929 et seq., 416.1429 et seq.).

Plaintiff appeared before the ALJ on January 31, 2007 without counsel.  After hearing her

testimony, the ALJ determined that Plaintiff was not disabled.  (Tr. 16).

Plaintiff filed a petition for appeal before the Social Security Administration Appeals

Council (the "Appeals Council").  The Appeals Council denied Plaintiff's request for review of

the ALJ's decision.  (Tr. 376-78).  As a result of that denial, Plaintiff initiated a civil action

before this Court.  (Tr. 381).  In response to the civil action, the Commissioner petitioned this

Court to remand the matter for further administrative proceedings.  (Tr. 383).  The Court granted

the Commissioner's motion.  (Id.).  The Commissioner then remanded the matter to the ALJ for

further proceedings.  (Tr. 384).

On April 1, 2009, the ALJ conducted a hearing.  Plaintiff appeared with counsel and

testified.  (Tr. 583-624).  The ALJ issued a decision on May 18, 2009, finding that Plaintiff was

not disabled, and therefore not entitled to either disability insurance benefits or SSI.  (Tr. 409-

24).  On April 10, 2010, the Appeals Council denied Plaintiff's request for review, and this

lawsuit followed.  (Tr. 363-65).

### B.  Plaintiff's Medical History

Plaintiff holds a Bachelor of Science degree in Computer Science from Rowan

University, and worked as a computer programmer and program developer prior to December 6,

2002.  (Tr. 423).  In addition to employment as a computer programmer, Plaintiff testified that

she held positions as a residential aide at a nursing home, and a desk clerk at a local Young

Men's Christian Association ("YMCA").  (Tr. 590-91).

Plaintiff claims that on December 6, 2002, she slipped and fell into a drainage ditch on

her property while shoveling snow.  (Tr. 341).  As a result of the fall, Plaintiff experienced pain

on the left side of her body.  (Tr. 121).  Three days after the fall, Plaintiff experienced "signs of concussion."  (Id.).  On January 17, 2003, Plaintiff explained that while she was standing in a prayer line at church, someone grabbed and squeezed her head, and twisted her torso.  The following day, "pain radiated down the left side of [her] neck and shifted from [her] lower to upper back."  (Id.).  Plaintiff did not seek medical treatment for her injuries.

On September 25, 2004, Plaintiff claimed that while playing "3 on 3 basketball" with her nephews, "a little boy got angry and rammed into her," causing severe pain in her lower back and injuring her right knee.  (Id.).  Once again, Plaintiff did not receive medical treatment for the knee injury.  On October 22, 2004, Plaintiff claims that she sustained another injury when her supervisor "hugged [her] and began rocking up and down on [her] back."  (Id.).  Plaintiff did not receive medical treatment for that injury, and claims that her employer terminated her employment "for not being able to get along with [its] employees."  (Id.).  Plaintiff claims that she experienced three other injuries between 2004 and 2005 that affected her physical condition. On December 1, 2004, she fell at a UPS thoroughfare, in June 2005 she hit her head on a playground, and in July 2005 someone pulled her hair while she was getting a perm at a hair salon.  (Id.).

Between December 2002 and 2005, Plaintiff's weight increased from approximately 179 pounds to 244 pounds.  (Tr. 122).  On August 28, 2005 Plaintiff weighed approximately 273 pounds.  (Id.).  Plaintiff stated that she gained weight after taking injections to control endometriosis.  (Id.).

As a result of her injuries, Plaintiff claims that she suffers from:  (1) severe migraine headaches; (2) fibromyalgia; (3) numbness, pain, and weakness in her legs; (4) nerve pain; and (5) sleep deprivation (Plaintiff complains that she generally sleeps two to four hours per night).

In addition, Plaintiff claims that due to nerve pain, she can only use her hands for one span of fifteen minutes during an eight-hour workday; that she can only sit comfortably for a period of twenty minutes on four separate intervals during an eight-hour workday; that she can only stand for ten minutes without experiencing any pain; and that she can only walk a distance of approximately two blocks on three occasions during an eight-hour period.  (Tr. 605-09).  In addition, Plaintiff complains that she can only lift approximately one gallon of milk.  (Tr. 609).

### C.  Medical Examinations

Plaintiff underwent a number of medical examinations between December 6, 2002 and 2008.  On December 6, 2002, Plaintiff underwent an examination and treatment at the Underwood-Memorial Hospital emergency room.  At that time, Plaintiff complained of pain in her left shoulder, neck, left hand, and left hip.  (Tr. 222).  The examining physician found no evidence of injury.  In particular, the x-ray results demonstrated "no sign of fracture, dislocation or other significant osseous."  (Tr. 227).  The physician released Plaintiff with instructions to call her family doctor in four days for follow-up treatment.  (Tr. 231).

Plaintiff applied for state disability in New Jersey.  In connection with her claim for benefits, Plaintiff underwent an examination by Dr. Nithyashuba Khona on July 15, 2005.  During that examination, Plaintiff described her fall on December 6, 2002, and recounted the other subsequent events that she believed contributed to her condition at the time of the examination.  In particular, Plaintiff told Dr. Khona that she experienced tenderness in her hand after someone at church held her hand tightly, and remarked that "she was hit by a small child who was playing a game."  (Tr. 232).  However, when asked to describe her pain, she was unable to provide Dr. Khona with a detailed description of her condition.  Based on his examination, Dr. Khona noted that Plaintiff could walk on her toes and heels, and squat halfway to the ground.

4

Dr. Khona also noted that Plaintiff experienced no difficulty getting on and off the examination table or rising from a chair without assistance.  In addition, Dr. Khona reported that Plaintiff's "[h]and and finger dexterity were intact," and that her "[g]rip was 5/5 bilaterally."  (Tr. 233).  Furthermore, Dr. Khona found that Plaintiff had full range of motion in her shoulders, elbows, forearms, wrists, and fingers bilaterally, and no joint inflammation or muscle atrophy.  (Id.).  Finally, Dr. Khona noted that Plaintiff had full range of motion in her hips, knees, and ankles.  (Id.).

In connection with his visual examination, Dr. Khona ordered x-rays of Plaintiff's right knee.  Those x-rays revealed osteoarthritic changes in Plaintiff's knee, but no fracture or dislocation.  (Tr. 237).  X-rays of Plaintiff's lumbar spine revealed mild degenerative changes but no fracture or subluxation.  (Id.).

Dr. Khona's examination produced no positive findings aside from Plaintiff's general complaints of pain.  Dr. Khona noted that despite Plaintiff's numerous complaints, she could not describe the pain, and never took any medication or consulted a physician.  (Tr. 234).  Dr. Khona concluded that Plaintiff should undergo a psychiatric evaluation.  (Id.).

On August 8, 2005, at the request of the Administration, Plaintiff underwent a psychiatric evaluation by Dr. Robert Waters.  (Tr. 239-42).  When asked why she could not work, Plaintiff described a variety of injuries she sustained between 2002 and 2005.  Specifically, Plaintiff reported that a member of her church pulled her hair on June 29, 2005, which caused her to suffer a mild stroke.  She also explained that a child hit her in the stomach on September 25, 2004, and claimed that a woman attacked her in church on January 17, 2003.  In addition, Plaintiff stated that she suffered a stroke on July 8, 2005, which affected her short-term memory and caused her "pressure headaches."  (Tr. 239).  With respect to her daily activity-level,

5

Plaintiff reported that she could wash dishes, shower, groom, and shop independently when necessary.

With respect to Plaintiff's mental condition, Dr. Waters concluded that she was "alert and oriented to the time, place, person, and situation," and that "her speech was coherent, goal directed, relevant and logical." (Tr. 241). In addition, Dr. Waters noted that "[Plaintiff's] affect was appropriate to her mood and content of dialogue," and that she "made adequate eye contact throughout the evaluation." (Id.). Dr. Waters noted that Plaintiff denied any suicidal ideation or suicidal attempts. (Id.). Moreover, Dr. Waters noted that Plaintiff's attention was excellent and her concentration was intact. For example, Plaintiff could repeat seven digits forward and six digits backwards and could complete simple mathematical equations such as $8 \times 5 = 40$ and $12 \times 6 = 72$. (Tr. 242). Significantly, Dr. Waters reported that Plaintiff's abstract reasoning was excellent, and her remote memory and immediate memory were intact. (Id.). The only deficiency Dr. Waters observed was that Plaintiff's recent memory was deficient, and remarked that the cause of that deficiency may be her reported "mild stroke." (Tr. 242).

As a result of his analysis, Dr. Waters concluded that Plaintiff's "mental status does not appear to be playing any significant role in her occupational limitations," and noted that "her physical/medical conditions present her most significant obstacle to adapting to a typical work environment . . . ." (Id.).

On August 10, 2005, Dr. David Schneider, a state agency medical consultant, reviewed the evidence in Plaintiff's medical file to determine whether she could perform work-related activities that required physical exertion. (Tr. 243-50). Dr. Schneider noted that Plaintiff complained of pain in all regions of her body, especially her back, knees and shoulders. (Tr. 244). Dr. Schneider also highlighted the fact that Dr. Khona evaluated Plaintiff on July 15, 2005

and identified no significant abnormalities, and that Plaintiff is morbidly obese.  (Id.).  Finally,

Dr. Scheider noted that Plaintiff could heel and toe walk and perform a half squat; and that x-

rays of Plaintiff's right knee and spine demonstrated evidence of osteoarthritis.  (Id.).

Dr. Schneider concluded that Plaintiff could stand and/or walk for a total of six hours in

an eight-hour workday, and carry fifty pounds occasionally and twenty-five pounds frequently.

Dr. Scheider also found no postural, manipulative, visual, communicative, or environmental

limitations.  (Tr. 245-47).  With respect to Plaintiff's symptoms, Dr. Schneider found that "the

symptoms of pain all over [Plaintiff's] body are attributable to . . . osteoarthritis and obesity,"

and concluded that "[t]he severity and duration of the symptoms are not proportionate to the

expected."  (Tr. 248).  Lastly, Dr. Schneider noted that Plaintiff could drive, shop, and perform

some household chores.  (Id.).

On July 31, 2006, Dr. Francis Grandizio, a chiropractor, evaluated Plaintiff.  Dr.

Grandizio reported that Plaintiff complained of pain in her neck, back, left buttock, posterior

thigh, and left and right upper extremities.  (Tr. 269).  Dr. Grandizio found that Plaintiff had

decreased cervical range of motion with pain upon flexion, extension, and rotation, but no

cervical spine abnormalities.  (Id.).  In addition, Dr. Grandizio found that Plaintiff had decreased

range of motion in the lumbar region and experienced pain in the lumbar region.  (Id.).

Plaintiff's Lasegues and Bechterews tests were positive, which Dr. Grandizio concluded

indicated probable disc involvement.  (Id.).

Dr. Grandizio diagnosed Plaintiff with lumbo pelvic somatic dysfunction with probable

disc involvement and cervico thoracic somatic dysfunction.  (Tr. 270).  Dr. Grandizio found that

Plaintiff's x-rays revealed facet degeneration at L5-S1 with narrowing of the neural formina.

(Id.).

Plaintiff saw Dr. Barry Butler for treatment on August 17, 2006, complaining of pain in her lower back, right shoulder and neck.  (Tr. 272).[1]  Dr. Butler noted that at the time of treatment, Plaintiff weighed 282 pounds, and displayed full range of motion in her neck, but complained of pain while flexing her neck.  Dr. Butler also reported that Plaintiff had tenderness in her lumbar spine, but noted that straight-leg raising was negative with no pain.  In addition, Dr. Butler reported that Plaintiff had full motor strength in her lower extremities, and her deep tendon reflexes were two-plus and equal.  Dr. Butler diagnosed Plaintiff with low back pain, shoulder pain, and obesity, and recommended rest, moist heat and Motrin.  (Tr. 272).  In addition, Dr. Butler recommended an MRI for Plaintiff's low back pain, and an x-ray for Plaintiff's shoulder pain.

On August 23 and 24, Plaintiff received an MRI and x-ray.  The x-ray of Plaintiff's right shoulder revealed no fracture, dislocation, or significant degenerative change.  (Tr. 275).  The MRI of Plaintiff's lower back revealed "minimal disc at L5-S1" and no significant stenosis.  (Tr. 274).  Thereafter, on August 29, 2006, Plaintiff visited Dr. Butler for a follow-up examination.  The Commissioner claims that the follow-up examination produced similar findings to Dr. Butler's examination on August 17, 2006.[2]

On September 5, 2006, Diane Thompson, a physical therapist, evaluated Plaintiff for physical therapy.  Thompson noted that Plaintiff experienced pain in her left shoulder and lower back, but concluded that Plaintiff's "[p]otential to improve with skilled physical therapy interventions is fair to good."  (Tr. 280).

---

[1] Neither party disputes Defendant's description of Dr. Butler's report.

[2] Neither party disputes Defendant's description of Dr. Butler's findings on August 29, 2006.

On September 21, 2006, Lisa Saulsbery, a physical therapist at Underwood-Memorial Hospital, discharged Plaintiff from physical therapy.  Saulsbery noted that during therapy, Plaintiff complained of pain in her lower back and lower extremities but refused to use moist heat to relieve the pain.  (Tr. 473).  Saulsbery also noted that Plaintiff reported difficulty taking steps, and was unable "to perform prolonged standing greater than 5 minutes to walk through stores."  (Id.).  Finally, Saulsbery reported that Plaintiff could not squat, kneel, lift or perform moderate household tasks, but noted that Plaintiff walked "with a normal gait."  (Id.).  Saulsbery recommended that Plaintiff continue her home exercise program and consult an orthopedic doctor.

On October 4, 2006, Plaintiff re-visited Dr. Hopkins, complaining of pain in her lower back, bilateral knee pain, and left shoulder pain.  (Tr. 317).  Plaintiff stated that she fractured her knee in 1998 and underwent an arthroscopy in 1982.  (Id.).  Plaintiff also informed Dr. Hopkins that she conducted stretching and range of motion exercises for four weeks, but still experienced tenderness in her left biceps and shoulder.  (Id.).  Plaintiff complained that her symptoms worsen when standing, walking, climbing stairs, sitting for prolonged periods, driving, and raising and lowering her legs.  (Id.).  Finally, Plaintiff complained that her symptoms worsened after physical therapy.  (Id.).

Dr. Hopkins found that Plaintiff could "heel toe" walk, and that straight leg raises were negative and Hoffman's sign was negative.  (Id.).  Plaintiff's motor strength was four out of five with no sensory deficit.  With respect to treatment, Dr. Hopkins recommended a whole body scan, connective tissue panel and aquatic therapy.  (Id.).

On October 6, 2006, Plaintiff underwent a whole body bone scan at Underwood-Memorial Hospital.  (Tr. 291).  The scan revealed "scattered diffuse degenerative joint changes."

(Id.).  Approximately two to two-in-a-half hours after Plaintiff received 22 mCi of Technetium 99m MDP, Plaintiff complained of headaches, nausea, neck pain and slurred speech.  At that time, Plaintiff was located in a room awaiting the whole body bone scan.  When a radiology nurse advised Plaintiff to go to the emergency room, Plaintiff refused.  (Id.).  After the scan was complete, Plaintiff agreed to visit the emergency room for further evaluation.  (Id.).

On November 17, 2006, Dr. Hopkins reviewed the results of the bone scan.  (Tr. 309).  Dr. Hopkins reported that the results of the bone scan demonstrated that Plaintiff suffered from systemic arthritis in her shoulders, knees, hips, ankles, and thoracic spine.  Plaintiff's labs were negative, but she complained of severe pain in her back.  Dr. Hopkins prescribed Naprosyn, and noted that Plaintiff could not do aquatic therapy because she did not possess adequate insurance. (Tr. 309).

Plaintiff began physical therapy for her back and left shoulder on January 12, 2007.  (Tr. 328).  At the outset of therapy, Plaintiff complained of pain on her left side since 2002, when she fell into the drainage ditch, and stated that she suffered an injury when she fell into a mail crate in December 2004.  Plaintiff also alleged chronic pain in all of her joints and muscles and complained of a left kidney problem.  (Id.).  On February 12, 2007, after eleven physical therapy sessions, Plaintiff continued to complain of pain in her left shoulder and upper arm, and lumbar. When asked to assess her level of discomfort, Plaintiff graded her pain as a ten out of ten, with ten being the most excruciating form of pain.  However, the physical therapist reported that Plaintiff demonstrated no objective signs of acute distress.  (Tr. 326).

Plaintiff reported to the Underwood-Memorial Hospital emergency room on January 17, 2008, complaining of nasal congestion, sore throat, and headaches.  (Tr. 540).  The treating

physician diagnosed Plaintiff with upper respiratory infection and sinusitis, and released her with instructions to take Levaquin and Allegra.  (Tr. 536).

On July 28, 2008, Plaintiff visited Dr. Sylvester Sutton Hamilton, complaining of lower back pain, and pain in her lower tailbone and knees.  (Tr. 449).  Plaintiff stated that she had difficulty sitting for prolong periods, and that exercise exacerbated the pain.  Additionally, Plaintiff noted that she had difficulty walking for exercise, and sleeping due to the pain in her knees and lower back.  Dr. Hamilton reported that Plaintiff had two four-week physical therapy sessions, and that those sessions increased flexibility but weakened her muscles.  (Id.).  Plaintiff attributed her troubles to fibromyalgia.  (Id.).

After conducting an examination, Dr. Hamilton determined that Plaintiff suffered from patellofemoral syndrome, chronic low back pain with no concerning findings, and persistent insomnia.  (Tr. 450).  In addition, Dr. Hamilton noted that "[o]rganic insomnia and . . . poor slepp [sic] is contributing to her chronic pain and questionable fibromyalgia."  (Id.) (emphasis added).  Dr. Hamilton recommended an increase in Plaintiff's intake of Amitryptaline, glucosamine chontritin, Tylenol RTC, exercise, and a follow-up appointment.  (Id.).

Plaintiff returned to Dr. Hamilton for an examination on October 3, 2008 complaining of joint pain in her lower back, tailbone and knees.  (Tr. 446).  Plaintiff reported that since her last visit the pain in her joints did not improve, but admitted that contrary to Dr. Hamilton's advice, she did not refill her dose of Amitriptyline or take glucosamine chondritin.  (Id.).  Plaintiff also complained of difficulty exercising and walking, and occasional eye pain and blurry vision.  (Id.).  Plaintiff noted that she could not take glucosamine chondritin because she could not afford to purchase the supplement.  And, once again, Plaintiff attributed her pain to fibromyalgia.  (Id.).

Dr. Hamilton identified no abnormalities during his examination.  (Tr. 447).  Dr. Hamilton's assessment noted patellofemoral syndrome, chronic low back pain, tenderness, poor sleep and affective/psychological component +/- depression.  Dr. Hamilton also found that Plaintiff experienced symptoms consistent with fibromyalgia.  (Tr. 447).

Plaintiff returned to Dr. Hamilton again on October 27, 2008.  (Tr. 443-45).  In addition to complaining of lower back pain, Plaintiff complained of pain in her right hand that ran from her pinkie finger to her right shoulder.  Plaintiff noted that the pain began in 2003, and claimed that the condition caused weakness in her wrist.  (Tr. 443).  Plaintiff also complained of muscle aches and pains in her joints, knees and back caused by the fall in December 2002.  Plaintiff also stated that she had difficulty sleeping and taking naps due to pain.  (Id.).

Once again, Dr. Hamilton's examination revealed no abnormal findings.  In addition, Dr. Hamilton's neurological examination revealed no sensory abnormality, but found that Plaintiff suffered diffuse aches and pains with poor sleep.  (Tr. 444-45).  Critically, Dr. Hamilton found that Plaintiff's symptoms were consistent with fibromyalgia, but noted that the symptoms "may be more a reflection of garden variety aches and pains compounded by depression."  (Tr. 445).  Finally, Dr. Hamilton noted a possible "axis two" component.[3]

On February 17, 2009, Dr. Kenneth Goldberg, a licensed psychologist, examined Plaintiff at the request of the Administration.  (Tr. 498).  Plaintiff reported "chronic pain, chronic weight problems, acid reflux, degenerative joint disease affecting all of her joints and her spine, small cysts above her right eye, affecting her vision, severe migraines, muscle and nerve damage in both arms, tendon damage in her right hand, memory problems, and insomnia."  (Tr. 498).  Plaintiff also denied any psychiatric history, and stated that a psychologist found that she

---

[3] "Axis two" refers to diagnosis of developmental or disability disorders based on the DSM-IV-TR system.  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 27-34 (4th ed. 2006).

suffered from a "short term memory problem" in 2005.  (Id.).  Plaintiff stated that she does not

take any medication because she has no insurance and no income.  (Id.).  With respect to her

mental condition, Plaintiff stated that she is not distressed, and has no problems with anger or

rage.  (Tr. 499).

Dr. Goldberg reported that Plaintiff was not suicidal, homicidal, or psychotic, and had no

problems with anger or rage.  (Tr. 498).  Dr. Goldberg also reported that the pace of Plaintiff's

speech was average and that her thought processes were unimpaired.  With respect to Plaintiff's

intellectual functioning, Dr. Goldberg found that Plaintiff had above average intelligence, and

found no strong evidence of short term memory problems, as Plaintiff alleged.  Specifically, Dr.

Goldberg reported that although "[Plaintiff] was told she had short term memory problems

during a prior evaluation . . . [t]he evidence for memory problems, here, is scant."  (Tr. 501).

Finally, Dr. Goldberg made no diagnosis in either Axis I or Axis II, and reported a global

assessment of functioning of 75 in Axis V.[4]

On April 2, 2009, at the request of the Administration, Dr. Gregory Maslow, an

orthopedic surgeon, examined Plaintiff.  (Tr. 506-18).  Plaintiff reported pain and general

weakness in her right knee, and some general pain in her left knee.  (Tr. 506).  In addition,

Plaintiff reported pain in her lower back that radiated into both legs, and specifically noted

episodes of complete numbness in her right leg.  Plaintiff stated that her symptoms worsened

with physical therapy.  (Id.).

Dr. Maslow reported that Plaintiff stood 66 inches and weighed 285 pounds.  Dr. Maslow

reported no swelling in Plaintiff's forearms.  (Tr. 507).  Plaintiff could stand and sit comfortably

---

[4] Based on the DSM-IV multi-axial system, Axis I calls for diagnosis of clinical syndromes (e.g. depression, schizophrenia, social phobia), Axis II calls for diagnosis of developmental disorders and personality disorders, and Axis V calls for the physician's assessment of an individual's overall level of functioning.  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 27-34 (4th ed. 2006).

and had normal balance and gait.  (Id.).  Plaintiff's strength test was normal, and her grip

strength was excellent.  After reviewing x-rays of Plaintiff's right knee, Dr. Maslow found that

Plaintiff had mild tri-compartmental degenerative disease with some spurring.  Dr. Maslow also

reported that the x-rays of Plaintiff's spine revealed no abnormality, and x-rays of Plaintiff's hips

revealed mild degenerative joint disease.  (Tr. 508).  Notably, contrary to Plaintiff's numerous

complaints, Dr. Maslow found "virtually nothing on clinical examination."  (Id.).  Dr. Maslow

concluded:

> In my opinion there is no evidence on clinical examination of
> significant knee problem and no evidence of a significant back
> problem on exam.  The x-rays are found to show some mild
> degenerative joint disease at the right knee and at both hips which
> is consistent with her obesity and age but are not disabling . . . .

(Id.).

At the request of the Administration, on April 2, 2009, Dr. Maslow also conducted an

assessment of Plaintiff's capacity to perform work-related activities.  (Tr. 510).  Dr. Maslow

reported that Plaintiff had no physical ailments that limited her ability to lift, carry, sit, stand,

walk or use her hands or feet in an employment setting.  (Tr. 510-14).  Dr. Maslow also found

that Plaintiff could climb stairs and ramps, stoop, kneel, crouch, crawl, and operate motor

vehicles.  (Tr. 514-15).

On April 3, 2009, Plaintiff returned to Underwood-Memorial Hospital, Family Medical

Center and saw Dr. Abhishekh Satyanand Govind.  (Tr. 557).  Plaintiff complained of chest pain

and shortness of breath for less than one month.  (Id.).  Plaintiff stated that she refused to see a

physician about her symptoms because she had a problem with charity care.  Plaintiff also noted

that she had a history of reflux, but stated that her chest pain was different than pain she

experienced previously.  Dr. Govind diagnosed Plaintiff with chest pain and shortness of breath,

and noted that further evaluation was necessary to rule out myocardial infarction.  (Tr. 559).  Dr. Govind also noted that Plaintiff had strong signs of "PVD."

On April 16, 2009, Plaintiff underwent a stress echocardiogram.  (Tr. 566).  The echocardiogram revealed no evidence of ischemia, but the examining physician recommended further evaluation of possible ischemia via nuclear perfusion scans.  (Tr. 566).

### D.  Additional Evidence Plaintiff submitted to the Court

On October 4, 2010, Plaintiff submitted the results of a stress test and a myocardial perfusion study conducted on June 2, 2009, at Underwood-Memorial Hospital, Department of Radiology.  (Letter from Pl. to the Court (Oct. 4, 2010)).  The stress test demonstrated that Plaintiff's electrocardiographic response to Persantine stress was equivocal for ischemia, and provoked symptoms compatible with clinical angina.  The myocardial perfusion study showed a "mild anterior defect [with] some partial reversibility in the rest images."  The reporting physician was unclear whether the defect demonstrated a small area of ischemia or breast tissue attenuation.  The study also demonstrated normal overall functioning of Plaintiff's left ventricle.

### E.  The Administrative Hearing

Plaintiff appeared before ALJ Daniel Shoemaker, Jr. on January 31, 2007 without counsel.  At the hearing, Plaintiff testified that she experienced pain in her lower back, right hand, and neck.  (Tr. 348-49).  Plaintiff also testified that she experienced numbness in her right hand and lower right leg, and, on occasion, difficulty maintaining her balance.  (Tr. 349).  Plaintiff also complained that when she sits or stands for extended periods of time, she experiences swelling in her legs and ankles.  (Tr. 350).  When asked how long she can sit comfortably, Plaintiff responded that she did not know, but noted that she experiences constant pain in her lower spine and tailbone.  Plaintiff also testified that she can walk continuously for a

maximum of fifteen minutes, and that she can wash dishes for ten minutes before she experiences pain in her lower back.  (Tr. 357).  Plaintiff also stated that she can only sleep for a total of two hours each night because of the constant pain she experiences as a result of her injuries.  (Tr. 359).  Lastly, Plaintiff complained of short-term memory loss.  For example, Plaintiff stated that on occasion she forgot to "get the child off the bus" when she was talking on the telephone.  (Tr. 361).

### F. The Re-Hearing

Plaintiff appeared before ALJ Shoemaker during a second hearing on April 1, 2009, represented by Christine DiNuzio Serochen.  During the hearing, the ALJ presented Mr. Mitchell A. Schmidt, a vocational expert, with the description of a hypothetical worker with Plaintiff's physical limitations, and asked him a series of questions concerning that worker's suitability for a variety of occupations.[5]  The ALJ described the hypothetical worker as an individual with "no mental, emotional or cognitive limitations" who had the physical capacity to:  (1) sit eight hours in a normal workday with normal breaks; (2) stand and/or walk six hours in a normal workday with normal breaks; (3) lift fifty pounds occasionally and twenty-five pounds frequently; and (4) carry twenty pounds occasionally and ten pounds frequently.  (Tr. 596).  The ALJ asked Schmidt whether a hypothetical worker with those physical limitations could perform the work Plaintiff performed prior to December 6, 2002.  Schmidt responded that the hypothetical worker could perform all of Plaintiff's previous jobs, because "all of her past work was . . . either sedentary or light . . . ."  (Tr. 597).  The only exception Schmidt identified was group home aide because it required an employee to sit, stand, or walk for more than six hours a day.  Schmidt also noted that Plaintiff could perform the work of a systems programmer – a job that falls within the

---

[5] The ALJ limited the inquiry to physical limitations, because he found that the record lacked any evidence that Plaintiff suffered from any mental, emotional, or cognitive limitations.  (Tr. 595).

broader field of data processing.  (Tr. 599).  Schmidt stated that there were approximately 7,000

data processing jobs in the Burlington, Gloucester County, and Camden regions and

approximately 1.5 million jobs available in the national economy.  (Tr. 599).  Schmidt also stated

that Plaintiff could perform jobs that involved "light duty" such as providing "social interactive

care for elderly, handicapped or convalescent persons."  (Id.).  Schmidt stated that there are

approximately 350 jobs in the local economy involving "social interactive care" for elderly

persons and approximately 800,000 in the national economy.  (Id.).

        The ALJ then asked whether Plaintiff could perform any unskilled occupations that

required limited physical exertion.  Schmidt replied that an unskilled individual with Plaintiff's

medical history could perform the duties of a garment sorter, laundry folder, nut sorter, or

document preparer, and stated that those jobs were readily available in the regional and national

economy (garment sorter – 2,000 jobs available in the region and 1.4 million jobs available in the

national economy; laundry folder – 400 jobs and 450,000 jobs respectively; nut sorter – 200 jobs

and 500,000 jobs respectively; document preparer – 350,000 jobs and 435,000 jobs respectively).

(Tr. 601).

        During the second hearing, Plaintiff testified that she experienced severe migraine

headaches, muscle spasms, and pain in her neck, shoulder, spine, lower back, knees, hips, ankles,

feet, hands and fingers.  (Tr. 602).  Plaintiff also testified that Dr. Hamilton diagnosed her

condition as fibromyalgia, and complained of numbness and nerve pain in her right hand.  (Id.;

Tr. 605).  In addition, Plaintiff testified that during a typical eight-hour workday she could (1)

use her hands continually for one period of fifteen minutes; (2) stand continuously for three

separate ten-minute intervals; and (3) walk up to two blocks on three separate occasions.  (Tr.

605-08).  Furthermore, Plaintiff testified that she could sit continuously for one period of twenty

minutes, walk continuously for forty-five minutes, and carry up to one gallon of milk. (Tr. 608). With respect to her mental condition, Plaintiff testified that she experienced severe headaches lasting forty-five minutes to one hour and blurred vision. (Tr. 612). Plaintiff also testified that she had difficulty remembering mundane facts such as where she stores personal belongings. (Tr. 615).

After Plaintiff testified, Plaintiff's attorney asked Schmidt whether an individual with the physical limitations Plaintiff described could perform any of the jobs he described before Plaintiff testified. (Tr. 617). Mitchell replied negatively. (Id.).

**G. The ALJ's Findings**

The ALJ conducted a thorough and exhaustive review of the record and determined that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act from December 6, 2002 through May 18, 2009. (Tr. 424). In reaching that conclusion, the ALJ made the following findings. First, the ALJ found that Plaintiff had the following severe impairments: osteoarthritis, chronic low back pain caused by lumbar disc disease, and morbid obesity. (Tr. 415). The ALJ determined that those impairments were severe because they limited Plaintiff's "ability to carry out basic work activities." (Id.). Although Plaintiff complained of fibromyalgia, the ALJ concluded that the record did not support Plaintiff's determination that she suffered from fibromyalgia. To make that determination, the ALJ relied upon guidelines established by the American College of Rheumatology. The ALJ noted that those guidelines state that a person suffers from fibromyalgia when he or she suffers from "widespread pain and specific pain in at least 11 of 18 tender point sites on digital palpation." (Id.). The ALJ noted that the record did not establish the presence of any tender points. The ALJ also noted that Plaintiff's treating

physician, Dr. Hamilton, found that Plaintiff suffered from "questionable" fibromyalgia on one occasion, and that Dr. Butler made no mention of fibromyalgia during his evaluation.  (Id.).

Second, the ALJ noted that Plaintiff did not have an impairment that met the criteria of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, when considered in conjunction with Plaintiff's diagnosis of obesity.  (Id.).  Third, the ALJ found that the record demonstrated that Plaintiff had the residual functional capacity to (1) sit for eight hours in a typical eight-hour workday with normal and customary breaks; (2) stand and/or walk for one hour continuously for a total of six hours in an eight-hour workday; (3) lift fifty pounds occasionally and twenty-five pounds frequently; and (4) carry twenty pounds occasionally and ten pounds frequently.  (Tr. 416).  Fourth, the ALJ found that Plaintiff was capable of performing the duties of a computer programmer.  (Tr. 423).

## II.      STANDARD

District court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently."  Fargnoli v. Masanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360).  The district court may not weigh the evidence "or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."). The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.") (quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978))). Furthermore, evidence is not substantial if it constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

## III.   DISCUSSION

In order to qualify for SSI benefits, a claimant must establish that she is aged, blind or disabled. 42 U.S.C. § 1381a. To qualify for disability insurance benefits, a claimant must establish that she is disabled. 42 U.S.C. § 423(a)(1)(E). A claimant is disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairment(s) must prevent him not only from doing his previous work, but also

20

from "engage[ing] in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner conducts a five-step inquiry to determine whether a claimant is disabled.  20 C.F.R. § 404.1520; Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  The Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful activity."  Such activity bars the receipt of benefits.  20 C.F.R. § 404.1520(a).  The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the Commissioner finds that the claimant's condition is severe, the Commissioner determines whether it meets or equals a listed impairment.  20 C.F.R. § 404.1520(d).  If the condition is equivalent to a listed impairment, the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's residual functional capacity ("RFC") and analyze whether the RFC would enable the claimant to return to her "past relevant work."  20 C.F.R. § 404.1520(e).  The ability to return to past relevant work precludes a finding of disability.  If the Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy."  Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)).

Here, the ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2007.  (Tr. 414).  Then, the ALJ properly conducted the five-step inquiry, and concluded that Plaintiff was not entitled to disability insurance benefits.  First, the ALJ determined that Plaintiff was not engaged in substantial gainful activity since December

6, 2002.  (Tr. 414).  Second, the ALJ examined Plaintiff's medical records and determined that

Plaintiff suffered from the following severe impairments:  osteoarthritis, chronic lower back pain

caused by lumbar disc disease, and morbid obesity.  (Tr. 415).  Third, the ALJ determined that

Plaintiff did not have an impairment or combination of impairments that met the requirements

for impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.).  Fourth, the ALJ

found that Plaintiff had the residual functional capacity necessary to perform a variety of jobs.

Specifically, the ALJ found that Plaintiff had the ability to sit for eight hours in an eight-hour

workday with normal and customary breaks; stand and/or walk for one hour continuously for a

total of six hours in an eight-hour workday; and lift fifty pounds occasionally and twenty-five

pounds frequently.  (Tr. 416).  Fifth, the ALJ determined that Plaintiff was capable performing

past relevant work as a computer programmer, and thus ineligible for disability benefits.  (Tr.

423-24).

## A.  Substantial Evidence Supports the ALJ's Conclusions

### 1.  Plaintiff's Musculoskeletal Impairments

The ALJ determined that Plaintiff's musculoskeletal impairments did not meet Listings

1.02 or 1.04.  Section 1.02 provides in relevant part:

> Major dysfunction of a joint(s) (due to any cause):  Characterized
> by gross anatomical deformity (e.g. subluxation, contracture, bony
> or fibrous ankylosis, instability) and chronic joint pain and
> stiffness with signs of limitation of motion or other abnormal
> motion of the affected joint(s), and findings on appropriate
> medically acceptable imaging of joint space narrowing, bony
> destruction, or ankylosis of the affected joint(s).  With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e.,
> hip, knee, or ankle), resulting in inability to ambulate effectively,
> as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.  Thus, in order to meet the requirements of Listing 1.02, the record must demonstrate:  (1) gross anatomical deformity; (2) chronic joint pain and stiffness with limited or abnormal motion of the affected joint(s); (3) evidence of joint space narrowing, bony destruction or ankylosis of the affected joint; and (4) inability to ambulate (walk) effectively.  Id.; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b.

Here, the record supports the ALJ's finding that Plaintiff did not suffer a major joint dysfunction.  First, there is no evidence that Plaintiff suffered a gross deformity of the knee.  X-ray results from Plaintiff's examination on December 6, 2002 revealed "no sign of fracture, dislocation or other significant osseous."  (Tr. 227).  Although Dr. Maslow examined x-rays of Plaintiff's knees and found evidence of mild degenerative joint disease, he attributed that condition to Plaintiff's obesity and age.  (Tr. 508).  Thus, the evidence in the record supports the ALJ's determination that Plaintiff failed to produce evidence of a gross anatomical deformity of the knee as defined by 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.02.

Substantial evidence also supports the ALJ's determination that Plaintiff's symptoms did not constitute an impairment of the spine as defined by 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.04.  In order to demonstrate an impairment of the spine, a Plaintiff must demonstrate "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)."  20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.04A.  The record supports the ALJ's finding that Plaintiff did not suffer any "muscle weakness, atrophy, reflex depression, or sensory loss."  (Tr. 421).  Although x-rays of Plaintiff's lumbar spine revealed mild degenerative changes, the record demonstrates that Plaintiff had full

use of her lower extremities.  (Tr. 237).  Dr. Khona noted that Plaintiff had full range of motion

in her hips, knees, and ankles.  (Tr. 233).  Dr. Butler examined Plaintiff on August 17, 2006 and

found that Plaintiff had full motor strength in her lower extremities.  (Tr. 272).  Dr. Hamilton

examined Plaintiff on multiple occasions and reported no abnormalities.  In particular, when Dr.

Hamilton examined Plaintiff's lower back on October 3, 2008, he identified "no concerning

findings."  (Tr. 447).  Finally, after examining Plaintiff, Dr. Maslow identified "no evidence of a

significant back problem."  (Tr. 508).

Therefore, the Court finds that substantial evidence supports the ALJ's determination that

Plaintiff did not suffer from a disorder of the spine causing motor loss "accompanied by sensory

or reflex loss," as required by 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.04.

### 2.  Plaintiff's Residual Functional Capacity

After closely examining the evidence, the ALJ determined that Plaintiff had the RFC

necessary to:  (1) sit for eight hours in an eight-hour workday with normal and customary breaks;

(2) stand and/or walk for one hour continuously, for a total of six hours in an eight-hour

workday; (3) lift fifty pounds occasionally and twenty-five pounds frequently; and (4) carry

twenty pounds occasionally and ten pounds frequently.  (Tr. 416).

Here, the Court is satisfied that the ALJ's determination regarding Plaintiff's RFC is

supported by substantial evidence.  The ALJ weighed the entire medical record and included the

relevant data that formed his RFC assessment in his opinion.  (See Tr. 416-23).  In particular, the

ALJ relied upon the opinions of Dr. Khona, Dr. Maslow, and Dr. Hamilton.  Dr. Khona stated

that Plaintiff had full range of motion in her shoulders, elbows, forearms, wrists, fingers, hips,

knees, and ankles.  (Tr. 232-34).  Likewise, Dr. Maslow failed to identify any evidence of an

impairment other than a few minor abnormalities in Plaintiff's right knee.  (Tr. 508).  Finally, Dr.

Hamilton reported that Plaintiff suffered from no significant joint abnormalities.  (Tr. 444-45).

The ALJ also relied upon the opinion of Dr. Schneider, a state medical examiner, who

determined that Plaintiff could lift and/or carry fifty pounds frequently; sit for six hours, and

stand and/or walk for six hours in an eight hour workday.[6]  (Tr. 422).

The ALJ also considered Plaintiff's subjective complaints, but determined that Plaintiff's

subjective complaints were incredible.  (Tr. 421-22).  The Third Circuit established the following

four-part test to determine the credibility of a social security claimant's subjective complaints.

That test requires:

> (1) that subjective complaints of pain be seriously considered, even
> where not fully confirmed by objective medical evidence; (2) that
> subjective pain may support a claim for disability benefits and may
> be disabling; (3) that when such complaints are supported by
> medical evidence, they should be given great weight; and finally
> (4) that where a claimant's testimony as to pain is reasonably
> supported by medical evidence, the ALJ may not discount
> claimant's pain without contrary medical evidence.

Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) (internal citations and quotation marks

omitted).  If an ALJ does not find the subjective claims of an individual credible, however, "the

determination or decision rationale must contain a thorough discussion and analysis of the

objective medical and other evidence, including the individual's complaints of pain or other

symptoms and the adjudicator's personal observations.  The rationale must include a resolution

of any inconsistencies in the evidence as a whole and set forth a logical explanation of the

individual's ability to work."  Social Security Ruling 95-5p; see Schaudeck, 181 F.3d at 433.

Here, the Court is satisfied that the ALJ provided "a thorough discussion and analysis of

the objective medical and other evidence," and found that Plaintiff's complaints of pain were

---

[6] See Spenser v. Commissioner of Soc. Sec., 87 F. App'x 265, 267 (3d Cir. 2004) (citing Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (noting that an ALJ may consider the opinion of a non-examining physician when it is consistent with other objective evidence in the record).

incredible.  <u>Schaudeck</u>, 181 F.3d at 433 (quoting Social Security Ruling 95-5p).  First, the ALJ considered Plaintiff's detailed account of her symptoms.  Specifically, the ALJ described Plaintiff's testimony that she continues to experience pain all over her body to include her neck, shoulders, spine, lower back hips, hands fingers, and knees.  (Tr. 420).  The ALJ also described Plaintiff's testimony that she could not write for more than fifteen minutes during an eight-hour workday, and that she could only sit for twenty minutes continuously for a total of ninety minutes during an eight-hour workday, stand for ten minutes continuously for a total of thirty minutes during an eight-hour workday, and lift a gallon of milk.  (<u>Id.</u>).  In addition, the ALJ recounted Plaintiff's testimony that she only showers five out of seven days per week and that she cannot get out of bed at least one day per week.  (<u>Id.</u>).

However, after recounting Plaintiff's testimony, the ALJ provided specific reasons why her testimony was not credible, citing to evidence in the record.  First, the ALJ noted that Plaintiff's Function Report stated that she performed many basic chores such as doing laundry, washing dishes, ironing, and mowing the lawn.  (Tr. 421).  Second, the ALJ noted that Plaintiff injured her leg while playing basketball, and determined that playing basketball is "consistent with the ability to perform light to medium work."  (Tr. 421).  Third the ALJ relied upon the reports of expert physicians who determined that Plaintiff appeared to suffer no acute distress despite her numerous complaints.  Fourth, the ALJ described Plaintiff's appearance and conduct at the two hearings, and noted that Plaintiff did not exhibit any evidence of significant pain.  (Tr. 421).  Fifth, the ALJ highlighted Plaintiff's history of physical treatment, noting that Plaintiff took no medication since the onset of her symptoms, and found no evidence that Plaintiff followed through with recommended chiropractic care.  (<u>Id.</u>).

Finally, the ALJ noted that the objective medical evidence contradicted Plaintiff's subjective complaints of pain.  The ALJ pointed to the medical reports of Dr. Khona, Dr. Maslow, and Dr. Hamilton, and found that each physician failed to identify any abnormalities that supported Plaintiff's complaints of pain.  (Id.).  Specifically, the ALJ noted that Dr. Khona reported that his examination failed to reveal any physical findings to substantiate Plaintiff's allegations of pain; (2) Dr. Maslow found no significant evidence of an impairment other than some minor abnormalities of the right knee; and (3) Dr. Hamilton found no significant abnormalities of Plaintiff's spinal processes or major joints.  (Id.).  As a result of those reports, the ALJ determined that Plaintiff's allegations that she could sit for only ninety minutes, stand for thirty minutes, and use her hands for fifteen minutes during an eight-hour workday were incredible.  Based upon the record, the Court finds that the ALJ's conclusions are supported by substantial evidence.

### 3.   Whether Plaintiff Could Perform Past Relevant Work

The ALJ determined that Plaintiff had the capacity to perform her past relevant work as a computer programmer, which the ALJ found was sedentary work.  (Tr. 423).  An individual's RFC is calculated at the fifth step of the five-step inquiry for determining eligibility for disability insurance benefits.  20 C.F.R. § 404.1520(f).  Once the Commissioner finds that the claimant is unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy," considering the individual's age, education, past work experience, and residual functional capacity.  Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)); 20 C.F.R. § 416.920(e) ("We use our residual functional capacity assessment . . . at the fifth step of the sequential evaluation process . . . to determine if you can adjust to other work.")).

Here, the ALJ determined that Plaintiff had the RFC necessary to perform the work of a computer programmer.  The ALJ based that determination on Plaintiff's testimony that computer programming required no significant standing or walking, and lifting or carrying more than ten pounds.  The ALJ also noted the lack of evidence necessary to support a finding that Plaintiff lacked the mental capability to perform the work of a computer programmer.  Specifically, the ALJ stated that "the consultative examination performed by Dr. Waters in August 2005, contrasted with the lack elsewhere in the present documentary evidence of any mental symptoms which persisted as long as one year."  (Tr. 423) (internal citations omitted).  Finally, the ALJ relied upon the testimony of the vocational expert who confirmed that Plaintiff could perform work consistent with her physical limitations.  (Tr. 423).

The Court finds that because the ALJ's determinations with respect to Plaintiff's RPC are supported by substantial evidence, remand is unnecessary.

### B.  Plaintiff's Arguments

Plaintiff claims that the ALJ's decision was based on a false and incomplete record, and that the record does not support the ALJ's conclusions.  Specifically, Plaintiff argues that:  (1) she had inadequate legal counsel during the appeal; (2) the ALJ should have further developed the record by examining whether Plaintiff had fibromyalgia and examining Plaintiff's visit to Dr. Lori L. Lewis in 2003; (3) the ALJ should not have considered medical reports from Dr. Maslow, Dr. Butler, and Dr. Khona because they were false and misleading; (4) the ALJ misinterpreted the vocational expert's analysis concerning Plaintiff's ability to find suitable employment in the national economy; (5) the ALJ did not consider the fact that Dr. Khona injured Plaintiff during her examination; (6) the ALJ should have subpoenaed records of Plaintiff's injuries before 2002; (7) the ALJ should have considered additional medical evidence;

(8) the transcript from the hearing on April 1, 2009 contains inaccuracies; and (9) the hearing process was unfair.

### 1.  Ineffective Assistance of Counsel

Plaintiff argues that the Court should remand the matter to the ALJ due to ineffective assistance of counsel.  Specifically, Plaintiff argues "Christine Dimuzio Sorochen handled this case the way she wanted often not consulting with the client or respecting the client [sic] wishes."  (Pl.'s Br., at 11).

 "A social security claimant who was represented by counsel of his own choosing cannot at a later time complain that the representation was inadequate."  Dowd v. Comm'r of Soc. Sec., No. 08-1272, 2009 WL 2246153, at *6 (W.D. Pa. 2009); see Hettinger v. Richardson, 365 F. Supp. 1245, 1246 (E.D. Pa. 1973); see also Cornett v. Atrue, 261 F. App'x 644, 651 (5th Cir. 2008) (noting that "[t]he Supreme Court has never recognized a constitutional right to counsel in Social Security proceedings").  Because there is no right to counsel in Social Security proceedings, and because Plaintiff chose counsel to represent her hearing before the ALJ on April 1, 2009, Plaintiff's contention that the Court should remand the matter to the ALJ for ineffective assistance of counsel is meritless.

### 2.  The ALJ Failed to Fully Develop the Record

Plaintiff contends that the ALJ failed to adequately develop the record.  Specifically, Plaintiff points to the ALJ's failure to:  (1) order Dr. Hamilton to reexamine Plaintiff's fibromyalgia; (2) subpoena the record of Dr. Lewis's medical examination in 2003; and (3) examine the evidence of Plaintiff's injury and treatment by Dr. Lewis between 2001 and 2002. For the following reasons, the Court finds that ALJ's failure to examine those issues does not constitute a failure to fully develop the record.

First, Plaintiff contends that "[f]ibromyalgia is Dr. Hamilton's diagnosis," and asserts that "Dr. Hamilton needs to clarify his diagnosis." (Pl.'s Br. at 14). However, the Court finds that the ALJ adequately developed the record of Plaintiff's fibromyalgia, and the ALJ's conclusion that Plaintiff did not suffer from fibromyalgia is supported by substantial evidence. The ALJ noted that contrary to Plaintiff's assertion that she suffered from fibromyalgia, Dr. Hamilton reported "<u>questionable</u> fibromyalgia." (Tr. 415) (emphasis added). In addition, Dr. Hamilton noted that although Plaintiff's symptoms were "consistent with fibromyalgia," her symptoms "may be more a reflection of garden variety aches and pains compounded by depression." (Tr. 445). Moreover, the ALJ noted that "[a] diagnosis of fibromyalgia is usually established under the American College of Rheumatology (ACR) guidelines on the basis of a history of widespread pain and specific pain in at least 11 of 18 tender point sites on digital palpation," and found that the record contained no evidence that Plaintiff experienced pain in any of those tender points. (Id.). Finally, the ALJ also noted that three examining physicians did not diagnose Plaintiff with fibromyalgia and Plaintiff's treating physician, Dr. Butler made no mention of fibromyalgia. (Id.). Thus, examining the record as a whole, the Court concludes that substantial evidence supports the ALJ's determination that Plaintiff did not suffer from "worsening fibromyalgia."[7]

Second, Plaintiff's argument that the ALJ did not consider the treatment she received from Dr. Lewis between 2001 and 2002 is unavailing. An ALJ must consider all relevant medical evidence, and must explain why relevant evidence has been rejected. Cotter v. Harris, 642 F.2d 700, 705-07 (3d Cir. 1981). Plaintiff claims that "Dr. Lori Lewis performed surgery on the plaintiff sometime between November 2001 and December 2002. She burned the inside nerves of both the plaintiff's big toes to prevent ingrown toenails which may have a bearing on

_____

[7] Moreover, even if Dr. Hamilton concluded that Plaintiff suffered from fibromyalgia, Dr. Hamilton did not report that fibromyalgia causes any limitations that would restrict Plaintiff's ability to perform work as a computer programmer.

the plaintiff's disability." (Pl.'s Br., at 19). However, the record is devoid of any evidence that Plaintiff was disabled prior to December 2002 as a result of the procedure she underwent with Dr. Lewis. Moreover, it is unclear whether the evidence of Plaintiff's treatment by Dr. Lewis is related to her claimed disability. Plaintiff argues that evidence of her treatment by Dr. Lewis "may have a bearing on [her] disability." (Id.). Moreover, Plaintiff fails to explain why the ALJ should have known to request records of her treatment prior to 2002 from Dr. Lewis, or why that treatment is related to her claim for disability benefits. Thus, Plaintiff's argument that the ALJ should subpoena records of her treatment by Dr. Lewis between 2001 and 2002 is unpersuasive.

Likewise, Plaintiff's argument that the ALJ failed to consider the fact that she received treatment from Dr. Lewis in 2003 is equally unavailing. Plaintiff states: "I saw Dr. Lewis in 02/2003 after falling into the county drainage ditch on 12/06/2002. I was having difficulty walking and pain in my lower back, legs and feet. Dr. Lewis examined me and prescribed a plastic heel orthotic for my shoe which helped." (Pl.'s Br., at 19). Plaintiff also claims that Dr. Lewis stated "she didn't want to do anything else until we find out what was going on with my back." (Pl.'s Br., at 19). However, there is no reason why the ALJ should have known to request those records from Dr. Lewis. Moreover, there is no evidence that Dr. Lewis's evaluation of Plaintiff produced results that contradict the ALJ's determination that Plaintiff has the RFC necessary to perform the work of a computer programmer. Furthermore, the record is replete with evidence supporting the ALJ's determination that Plaintiff had the RFC necessary to perform the work of a computer programmer. Accordingly, Plaintiff's argument that the ALJ failed to consider the fact that she received treatment from Dr. Lewis in 2003 is unpersuasive.

### 3. False or Misleading Medical Reports

Plaintiff claims that the reports submitted by Dr. Maslow and Dr. Khona are inaccurate and misleading.  (See Pl.'s Br. at 6; id. at 13; id. at 16; id. at 15).  However, Plaintiff's allegation that Dr. Maslow and Dr. Khona lied in their reports is beyond the scope of the Court's review because the Court's review does not extend to evaluating the credibility of medical reports. Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992); Plaintiff v. Astrue, No. 07-5769, 2008 WL 5272055, at *6 (D.N.J. 2008).

### 4. The ALJ's Interpretation of the Vocational Expert's Testimony

Plaintiff contends that the ALJ misinterpreted the vocational expert's testimony. Specifically, Plaintiff claims that "the vocational expert agreed that the plaintiff would not be able to perform any gainful employment that exists in the national economy."  (Pl.'s Br., at 18).

The Court finds that the ALJ appropriately interpreted the vocational expert's testimony. To support her argument on appeal, Plaintiff presents an incomplete account of the ALJ's findings.  Plaintiff highlights the fact that the ALJ stated that a hypothetical individual cannot perform the work of a computer programmer if she:  (1) needs to take unscheduled rest periods that can last between four to five hours per day; (2) is capable of standing for up to thirty minutes per day and sitting for fifteen to twenty minutes at a time for a maximum of one and one half hours during an eight-hour workday; and (3) is capable of walking one block for a maximum of two times per day.

However, the ALJ determined that Plaintiff did not possess the physical limitations listed above.  Instead, the ALJ determined that Plaintiff had the RFC to sit for eight hours with normal and customary breaks, and stand or walk for one hour continuously during the course of a normal eight-hour workday; lift fifty pounds occasionally and twenty-five pounds frequently; and carry

twenty pounds occasionally and ten pounds frequently.  (Tr. 416).  When the ALJ asked the vocational expert whether a hypothetical worker with those capabilities could perform the work of a computer programmer, the vocational expert responded affirmatively.  Therefore, Plaintiff's argument that the vocational expert's testimony does not support the ALJ's decision is unpersuasive.

### 5.   Dr. Khona Injured Plaintiff

Plaintiff argues that Dr. Khona injured her during an examination.  Because Plaintiff's allegation that Dr. Khona injured her is not relevant to the Court's determination of whether there is substantial evidence in the record to support the ALJ's findings, the Court summarily disposes of Plaintiff's contention that Dr. Khona injured her.

### 6.   The ALJ Should Have Considered Additional Medical Evidence

Plaintiff argues that the ALJ should have considered evidence that:  (1) Dr. Barbara Roehl found that Plaintiff had a leaking "sac" in her back; (2) Dr. Mark Grzeskowiak stated that Plaintiff's "condition [was] chronic," and suggested that Plaintiff consult "Cooper Bone & Joint Institute" for further treatment; (3) Dr. Hamilton stated "you have fibromyalgia" during his last examination; (4) Dr. Vivek Sailem "witnessed . . . that [Plaintiff] was unable to due [sic] . . . physical exercise"; (5) Dr. Tomaio refused to examine her; and (6) that when Dr. Stanley David lifted her legs she lost her balance.  (Pl.'s Br. 19-21).

The ALJ must consider all relevant medical evidence, and must explain why relevant evidence has been rejected.  Cotter v. Harris, 642 F.2d 700, 705-707 (3d Cir. 1981).  Moreover, the ALJ has a duty to develop the record, and "must secure relevant information regarding a claimant's entitlement to social security benefits."  Ventura, 55 F.3d at 902.

Plaintiff's argument that the ALJ should have considered the aforementioned evidence is unavailing. First, Dr. Roehl's alleged statement that Plaintiff had a leaking "sac" in her back is not relevant to whether the ALJ erroneously determined that Plaintiff could perform the work of a computer programmer. Even if, as Plaintiff argues, she had a leaking sac in her back, Plaintiff does not allege that a leaking sac limits her RFC or otherwise prevents her from performing the work of a computer programmer. Second, Plaintiff's allegation that Dr. Mark Grzeskowiak stated that her condition is "chronic" also does not further her argument. Notwithstanding Dr. Grzeskowiak's alleged statement that Plaintiff's condition was "chronic," the record is replete with evidence that Plaintiff's condition did not prevent her from performing the work of a computer programmer and the ALJ specifically identified that evidence in his opinion. Third, the Court already rejected Plaintiff's contention that the ALJ should have further developed the record to determine whether she had fibromyalgia. Finally, the remainder of Plaintiff's arguments have no bearing on whether the ALJ inappropriately determined that Plaintiff had the RFC necessary to perform the work of a computer programmer. Plaintiff's allegations concerning Dr. Sailem, Dr. Tomaio, and Dr. David provide no evidence that Plaintiff could not perform the work of a computer programmer. At best, those allegations merely demonstrate that Plaintiff had difficulty standing and maintaining her balance for short periods of time. However, the ALJ found that Plaintiff had the RFC to sit for eight hours with normal and customary breaks, and stand and/or walk for one hour continuously during the course of a normal eight-hour workday; lift fifty pounds occasionally and twenty-five pounds frequently; and carry twenty pounds occasionally and ten pounds frequently. (Tr. 416). Therefore, because the ALJ conducted a thorough review of the record and determined that Plaintiff could perform the work of a computer programmer, and because Plaintiff fails to prove that the ALJ erred by not

considering the aforementioned evidence, the Court will uphold the ALJ's determination that Plaintiff is not disabled.

### 7.   The Court Should Subpoena Plaintiff's Pre-2002 Medical Records

Plaintiff argues that the Court erred by not considering reports of her medical condition prior to December 2002.

As previously mentioned, the ALJ must consider all relevant medical evidence, and must explain why relevant evidence has been rejected.  Cotter, 642 F.2d at 705-707.  Moreover, the ALJ has a duty to develop the record, and "must secure relevant information regarding a claimant's entitlement to social security benefits."  Ventura, 55 F.3d at 902.  Here, the record demonstrates that Plaintiff became disabled on December 6, 2002.  (Tr. 105).  There is no evidence that Plaintiff sustained an injury prior to December 6, 2002 that restricted her ability to perform the work of a computer programmer.  As a result, it is unclear why Plaintiff's injuries prior to December 2002 are relevant to her request for disability benefits due to an injury that occurred in December 2002.

Therefore, the Court finds that the ALJ did not err by considering only evidence of Plaintiff's physical condition after December 6, 2002.

### 8.   The Transcript of the Hearing on April 1, 2009

Plaintiff argues that the transcript of the hearing conducted by the ALJ on April 1, 2009 is erroneous.  Plaintiff submits no evidence to support her assertion that the transcript is erroneous.  Instead, Plaintiff disputes the transcript based upon her own recollection of the hearing.  (Pl.'s Br., at 23).

The Court finds that there is no evidence that the court transcript is erroneous.  When determining disability, "the ALJ is entitled – and required – to rely on the administrative record .

. . ."  Whitehurst v. Comm'r of Soc. Sec., No. 06-0261, 2008 WL 724164, at *9 (N.D.N.Y. Mar.

17, 2008); see 20 C.F.R. §§ 404.1512, 416.912.  Here, the Court's review of the administrative

record reveals that the ALJ's decision accurately reflects the contents of the transcript.  Plaintiff

puts forth no evidence that suggests that the transcript is erroneous.  Accordingly, Plaintiff's

challenge to the administrative transcript is meritless.  See Whitehurst, 2008 WL 724164, at *9

(rejecting Plaintiff's claim that the administrative transcript was erroneous because Plaintiff

"submitted no evidence which would suggest that any portion of the administrative transcript

[was] erroneous.").

### 9.    The ALJ Hearing was Fundamentally Unfair

Plaintiff argues that the hearing process was unfair.  Specifically, Plaintiff claims:  (1) the

judge should have further developed the record; (2) the transcripts are erroneous; (3) the ALJ

failed to consider whether obesity caused any work-related limitations in addition to those

resulting from Plaintiff's other impairments; and (4) Plaintiff did not have the opportunity to

question medical experts.  (Pl.'s Br., at 13).

A social security income "claimant has a due process right to a hearing that is

fundamentally fair."  Mayes v. Soc. Sec. Admin., 190 F. App'x 183, 186 (3d Cir. 2006) (citing

Richardson v. Perales, 402 U.S. 389, 401 (1971)).  That right includes, at minimum, the right to

counsel at an ALJ hearing, an impartial decision-maker, and the opportunity to cross-examine

experts concerning the content of any post-hearing reports.  See 42 U.S.C. § 406(a) (right to an

attorney at an ALJ hearing); Wanko v. Barnhart, 91 F. App'x 771, 774 (3d Cir. 2004) (impartial

decisionmaker); Wallace v. Bowen, 869 F.2d 187, 192 (3d Cir. 1988) (right to cross-examine

authors of post-hearing reports).

The Court finds that the ALJ provided Plaintiff a fundamentally fair adjudication of her social security claim.  First, as previously mentioned in this Opinion, Plaintiff's arguments that the ALJ failed to adequately develop the record and that the administrative transcript is erroneous are meritless.  Second, the record flatly contradicts Plaintiff's argument that the ALJ failed to consider whether obesity caused any work-related limitations.  In the Opinion dated May 18, 2009, the ALJ stated:

> When considered in conjunction with limitations caused by obesity under the guidelines of SSR 02-1p, the [ALJ] finds that the claimant has the residual functional capacity to sit for 8 hours in an 8-hour workday with normal and customary breaks; can stand and/or walk for 1 hour continuously, up to a total of 6 hours in an 8-hour workday; and can lift 50 pounds occasionally and lift 25 pounds frequently.  She can carry only 20 pounds occasionally and carry only 10 pounds frequently.

(Tr. 422).  Thus, Plaintiff's argument that the ALJ failed to consider the effect of obesity when determining whether she had the RFC necessary to perform the work of a computer programmer is unpersuasive.

Finally, Plaintiff's argument that "[her] right to question medical experts and reports on record were violated by the administrative law judge" fails because there is no evidence that Plaintiff complied with the statutory requirements for subpoenaing a document or expert prior to the hearing on April 1, 2009.  20 C.F.R. § 404.950(d)(2) provides in relevant part, "[p]arties to a hearing who wish to subpoena documents or witnesses must file a written request for the issuance of a subpoena with the administrative law judge . . . at least 5 days before the hearing date."  There is no evidence that Plaintiff subpoenaed any medical experts or reports five days prior to the hearing on April 1, 2009.  Accordingly, Plaintiff's argument that the ALJ denied her the opportunity to question medical experts at trial is meritless.  See Richardson, 402 U.S. at 404 (finding that plaintiff waived cross-examination by failing to subpoena reporting physician).

**IV.     CONCLUSION**

For the reasons discussed above, the Court finds that the ALJ had substantial evidence to determine that Plaintiff was not disabled within the meaning of the Social Security Act.  An appropriate order shall enter today.


Dated:  6/14/2011                                                    /s/ Robert B. Kugler
                                                                        ROBERT B. KUGLER
                                                                        United States District Judge

38